Robert V. Prongay (SBN 270796)
  *rprongay@glancylaw.com*
Charles Linehan (SBN 307439)
  *clinehan@glancylaw.com*
GLANCY PRONGAY WOLKE & ROTTER LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Plaintiff Hunter Hanlon Taylor*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUNTER HANLON TAYLOR, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| HERCULES CAPITAL, INC., SCOTT BLUESTEIN, and SETH H. MEYER, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

CLASS ACTION COMPLAINT

Plaintiff Hunter Hanlon Taylor ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Hercules Capital, Inc. ("Hercules Capital" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Hercules Capital; and (c) review of other publicly available information concerning Hercules Capital.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Hercules Capital securities between May 1, 2025 and February 27, 2026, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Hercules Capital is a private credit firm, also known a Business Development Company, which specializes in making private loans to companies. Hercules Capital describe itself as the "the largest non-bank source of venture financing in the market" and "the lender of choice for entrepreneurs and venture capital firms seeking growth capital financing." The Company principally invests in debt securities, and purports to manage more than $5.7 billion of assets as of December 31, 2025.  The Company also purports to maintain a disciplined and robust deal origination process, including rigorous sourcing, due diligence, and valuation, in order to maintain the value and stability of its portfolio. Maintaining a strong valuation procedure is vital to Hercules Capital as investors measure key financial metrics like Net Asset Value ("NAV") when determining the overall health of the Company's portfolio. NAV is vital to investors because, as a Business Development Company, Hercules is statutorily limited in the amount of debt investments it can make, as measured relative to its total assets and NAV.

3.      On February 27, 2026, at approximately 11:00 a.m. EST, Hunterbrook Media, an investment focused media reporting outlet, published a report entitled "The Myth of Hercules

Capital." The report stated that, "according to a former Hercules analyst who worked on deal sourcing" the Company's process for deal sourcing essentially amounted to "[g]o[ing] on the website for Google Ventures and just see what they invest in and just copy it." The report stated, according to a former employee, deal sourcing managers "don't want anything else," and essentially just rely on other investors to have done due diligence, instead of doing their own. The report continued, revealing that, "once Hercules makes the loans, the valuation process itself may warrant scrutiny," as "[a] former member of Hercules' finance team described a small, overstretched team with few checks in place." This second former employee revealed the valuations team "consisted of just four people in a single reporting line responsible for dozens of companies," with "few checks or cross-team review." The former employee noted this was contrary to how things were done at other public companies where, in contrast "[t]here is a strong push to do things the right way, to reinvent, to make sure that we're double-checking, triple-checking." The report stated the former employee found this was not the case at Hercules. The report also alleged that Hercules Capital underrepresents its significant software debt exposure. The report stated the Company does this, in part, by "assign[ing] certain businesses that describe themselves as software companies to categories outside of software." The report also cast doubt on to the Company's book value, which marks its software debt "at 100 cents on the dollar" despite "billions worth of [software] debt across the industry falling into distressed territory."

4.      On this news, Hercules's stock price fell $1.22, or 7.9%, to close at $14.21 per share on February 27, 2026, on unusually heavy trading volume.

5.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) the Company overstated the due diligence with which it conducted its deal sourcing and/or loan origination process; (2) the Company overstated the due diligence with which it conducted its portfolio valuation process; (3) the Company reported misclassified portfolio investments; (4) as a result of the foregoing, the Company overstated and/or misrepresented its portfolio valuations; and (5) that,

as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

10.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11.     Plaintiff Hunter Hanlon Taylor, as set forth in the accompanying certification, incorporated by reference herein, purchased Hercules Capital securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12. Defendant Hercules Capital is incorporated under the laws of Maryland with its principal executive offices located in San Mateo, California. Hercules Capital's common stock trades on the New York Stock Exchange ("NYSE") exchange under the symbol "HTGC."

13. Defendant Scott Bluestein ("Bluestein") was the Company's Chief Executive Officer ("CEO") at all relevant times.

14. Defendant Seth H. Meyer ("Meyer") was the Company's Chief Financial Officer ("CFO") at all relevant times.

15. Defendants Bluestein and Meyer (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

### SUBSTANTIVE ALLEGATIONS

#### Background

16. Hercules Capital is a Business Development Company which describe itself as the "the largest non-bank source of venture financing in the market" and "the lender of choice for entrepreneurs and venture capital firms seeking growth capital financing." The Company principally invests in debt securities, and purports to manage more than $5.7 billion of assets as of December 31, 2025. The Company also purports to maintain a disciplined and robust deal origination process including sourcing, due diligence, and valuation, in order to maintain the value and stability of its portfolio. Maintaining a strong valuation process is vital as investors measure key financial metrics

like NAV when determining the overall health of the Company's portfolio. NAV is vital to investors because, as a Business Development Company, Hercules is statutorily limited in the amount of debt investments it can make, as measured relative to its total assets and NAV.

**Materially False and Misleading**

**Statements Issued During the Class Period**

17.    The Class Period begins on May 1, 2025.[1] On that day, Hercules Capital issued a press release announcing its earnings for the quarter ended March 31, 2025. The press release touted the Company's financial results, including the purported value of its total investment portfolio and alleged NAV of $11.55. Specifically, the press release stated as follows, in relevant part:

**Debt Investment Portfolio**

Hercules delivered Q1 gross new debt and equity commitments totaling $1.02 billion and Q1 gross new fundings totaling $539.1 million.

During the first quarter, Hercules realized early loan repayments of $131.8 million which, along with normal scheduled amortization of $12.7 million, resulted in total debt repayments of $144.5 million. Excluding $55.9 million of early loan repayments that were attributable to existing investments refinanced by Hercules, early loan repayments were $75.9 million.

The new debt investment origination and funding activities led to a ***net debt investment portfolio increase of $269.8 million*** during the first quarter on a cost basis.

**The Company's total investment portfolio, (at cost and fair value) by category, quarter-over-quarter is highlighted below:**

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

**Total Investment Portfolio: Q4 2024 to Q1 2025**

| (in millions) | Debt | Equity & Other Investments | Warrants | Total Portfolio |
|---|---|---|---|---|
| Balances at Cost at December 31, 2024 | $ 3,515.4 | $ 162.2 | $ 31.2 | $ 3,708.8 |
| New fundings[a] | 531.5 | 7.3 | 0.3 | 539.1 |
| Fundings assigned to or directly funded by Adviser Funds | (121.9) | (2.2) | — | (124.1) |
| Principal payments received on investments | (12.7) | — | — | (12.7) |
| Early payoffs[b] | (131.8) | — | — | (131.8) |
| Net changes attributed to conversions, liquidations, and fees | 4.7 | 11.2 | (0.2) | 15.7 |
| Net activity during Q1 2025 | 269.8 | 16.3 | 0.1 | 286.2 |
| Balances at Cost at March 31, 2025 | $ 3,785.2 | $ 178.5 | $ 31.3 | $ 3,995.0 |
| | | | | |
| Balances at Fair Value at December 31, 2024 | $ 3,494.6 | $ 134.9 | $ 30.5 | $ 3,660.0 |
| Net activity during Q1 2025 | 269.8 | 16.3 | 0.1 | 286.2 |
| Net change in unrealized appreciation (depreciation) | (30.0) | 2.4 | 0.8 | (26.8) |
| FX unrealized gain (loss) | 4.8 | 0.2 | 0.1 | 5.1 |
| Total net activity during Q1 2025 | 244.6 | 18.9 | 1.0 | 264.5 |
| Balances at Fair Value at March 31, 2025 | $ 3,739.2 | $ 153.8 | $ 31.5 | $ 3,924.5 |

\*                    \*                    \*

**Net Asset Value**

As of March 31, 2025, the Company's net assets were $2.00 billion, compared to $1.99 billion at the end of Q4 2024. NAV per share decreased 0.9% to $11.55 on 173.3 million outstanding shares of common stock as of March 31, 2025, compared to $11.66 on 170.6 million outstanding shares of common stock as of December 31, 2024. The decrease in NAV per share was primarily attributed to the change in net unrealized losses during the quarter.

18.    On May 1, 2025, the Company submitted its quarterly report for the period ended March 31, 2025 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The quarterly report further reported the purported valuation procedure the Company takes, the fair value of the Company's portfolio by industry sector, and the Company's portfolio and investment activity, including that prospective portfolio companies are "***subject to completion of our due diligence and final investment committee approval process,***" and commitments are subject to "***underwriting and ongoing portfolio maintenance.***" Specifically, the quarterly report stated as follows, in relevant part:

In accordance with procedures approved by its Board, the Company values investments on a quarterly basis following a multistep valuation process. The quarterly Board approved multi-step valuation process is described below:

(1) The Company's quarterly valuation process begins with each portfolio company being initially valued by the investment professionals responsible for the portfolio investment;

(2) Preliminary valuation conclusions and business-based assumptions, along with any applicable fair value marks provided by an independent firm, are reviewed with the Company's investment committee and certain member(s) of credit group as necessary;

(3) The Valuation Committee reviews the preliminary valuations recommended by the investment committee and certain member(s) of the credit group of each investment in the portfolio and determines the fair value of each investment in the Company's portfolio in good faith and recommends the valuation determinations to the Audit Committee of the Board;

(4) The Audit Committee of the Board provides oversight of the quarterly valuation process in accordance with Rule 2a-5, which includes a review of the quarterly reports prepared by the Valuation Committee, reviews the fair valuation determinations made by the Valuation Committee, and approves such valuations for inclusion in public reporting and disclosures, as appropriate; and

(5) The Board, upon the recommendation of the Audit Committee, discusses valuations and approves the fair value of each investment in the Company's portfolio.

\*                              \*                              \*

The following table shows the fair value of the Company's portfolio by industry sector as of March 31, 2025 and December 31, 2024:

| (in thousands) | March 31, 2025 | | December 31, 2024 | |
| --- | --- | --- | --- | --- |
| | Investments at Fair Value | Percentage of Total Portfolio | Investments at Fair Value | Percentage of Total Portfolio |
| Software | $ 1,262,813 | 32.2 % | $ 1,081,100 | 29.5 % |
| Drug Discovery & Development | 1,119,941 | 28.5 % | 1,080,390 | 29.5 % |
| Healthcare Services, Other | 625,556 | 15.9 % | 610,184 | 16.7 % |
| Consumer & Business Services | 374,561 | 9.6 % | 372,641 | 10.2 % |
| Electronics & Computer Hardware | 167,370 | 4.3 % | 162,888 | 4.5 % |
| Diversified Financial Services | 117,366 | 3.0 % | 113,491 | 3.1 % |
| Medical Devices & Equipment | 75,238 | 1.9 % | 74,962 | 2.0 % |
| Space Technologies | 49,527 | 1.3 % | 45,700 | 1.2 % |
| Biotechnology Tools | 34,819 | 0.9 % | 35,434 | 1.0 % |
| Communications & Networking | 27,601 | 0.7 % | 27,700 | 0.8 % |
| Information Services | 24,923 | 0.6 % | 24,356 | 0.7 % |
| Sustainable and Renewable Technology | 22,396 | 0.6 % | 27,696 | 0.8 % |
| Manufacturing Technology | 20,653 | 0.5 % | 1,162 | 0.0 % |
| Consumer & Business Products | 1,139 | 0.0 % | 1,497 | 0.0 % |
| Semiconductors | 425 | 0.0 % | 704 | 0.0 % |
| Media/Content/Info | 114 | 0.0 % | 63 | 0.0 % |
| Drug Delivery | 8 | 0.0 % | 10 | 0.0 % |
| **Total** | $ 3,924,450 | 100.0 % | $ 3,659,978 | 100.0 % |

\*                              \*                              \*

***Portfolio and Investment Activity***

The total fair value of our investment portfolio as of March 31, 2025 and December 31, 2024 was as follows:

| (in millions) | Fair Value | |
| --- | --- | --- |
| | March 31, 2025 | December 31, 2024 |
| Debt | $ 3,739.2 | $ 3,494.6 |
| Equity | 146.8 | 128.7 |
| Warrants | 31.5 | 30.5 |
| Investment Funds & Vehicles | 7.0 | 6.2 |
| Total Investment Portfolio | $ 3,924.5 | $ 3,660.0 |

Our investments in portfolio companies take a variety of forms, including unfunded contractual commitments and funded investments. Not all debt commitments represent future cash requirements. Unfunded contractual commitments depend upon a portfolio company reaching certain milestones before the debt commitment is available to the portfolio company, which is expected to affect our funding levels. *These commitments are subject to the same underwriting and ongoing portfolio maintenance as the on-balance sheet financial instruments that we hold.* Debt commitments generally fund over the year following the underwriting of such debt commitment. From time to time, unfunded contractual commitments may expire without being drawn and thus do not represent future cash requirements.

Prior to entering into a contractual commitment, we generally issue a non-binding term sheet to a prospective portfolio company. *Non-binding term sheets are subject to completion of our due diligence and final investment committee approval process*, as well as the negotiation of definitive documentation with the prospective portfolio companies. These non-binding term sheets generally convert to contractual commitments in approximately 90 days from signing and some portion may be assigned or allocated to or directly originated by the Adviser Funds prior to or after closing. Not all non-binding term sheets are expected to close and do not necessarily represent future cash requirements.

19.     On July 31, 2025, Hercules Capital issued a press release announcing its earnings for the quarter ended June 30, 2025. The press release touted the Company's financial results, including the purported value of its total investment portfolio and alleged NAV of $11.84. Specifically, the press release stated as follows, in relevant part:

**Debt Investment Portfolio**

Hercules delivered Q2 gross new debt and equity commitments totaling $1.0 billion and Q2 gross new fundings totaling $709.1 million.

During the second quarter, Hercules realized early loan repayments of $267.4 million which, along with normal scheduled amortization of $2.6 million, resulted in total debt repayments of $270.0 million.

The new debt investment origination and funding activities led to a net debt investment portfolio increase of $192.1 million during the second quarter on a cost basis.

**The Company's total investment portfolio, (at cost and fair value) by category, quarter-over-quarter is highlighted below:**

**Total Investment Portfolio: Q1 2025 to Q2 2025**

| (in millions) | Debt | Equity & Other Investments | Warrants | Total Portfolio |
|---|---|---|---|---|
| Balances at Cost at March 31, 2025 | $ 3,785.2 | $ 178.5 | $ 31.3 | $ 3,995.0 |
| New fundings[a] | 705.8 | 1.0 | 2.3 | 709.1 |
| Fundings assigned to or directly funded by Adviser Funds | (150.8) | (0.4) | (0.5) | (151.7) |
| Principal payments received on investments | (2.6) | — | — | (2.6) |
| Early payoffs[b] | (267.4) | — | — | (267.4) |
| Assets Sale - Participants | (47.5) | — | — | (47.5) |
| Net changes attributed to conversions, liquidations, and fees | (45.4) | 4.9 | (1.9) | (42.4) |
| Net activity during Q2 2025 | 192.1 | 5.5 | (0.1) | 197.5 |
| Balances at Cost at June 30, 2025 | $ 3,977.3 | $ 184.0 | $ 31.2 | $ 4,192.5 |
| | | | | |
| Balances at Fair Value at March 31, 2025 | $ 3,739.2 | $ 153.8 | $ 31.5 | $ 3,924.5 |
| Net activity during Q2 2025 | 192.1 | 5.5 | (0.1) | 197.5 |
| Net change in unrealized appreciation (depreciation) | 38.9 | 2.6 | 4.1 | 45.6 |
| FX unrealized gain (loss) | 8.5 | 0.4 | — | 8.9 |
| Total net activity during Q2 2025 | 239.5 | 8.5 | 4.0 | 252.0 |
| Balances at Fair Value at June 30, 2025 | $ 3,978.7 | $ 162.3 | $ 35.5 | $ 4,176.5 |

\*                          \*                          \*

**Net Asset Value**

As of June 30, 2025, the Company's net assets were 2.2 billion, compared to $2.0 billion at the end of Q1 2025. NAV per share increased 2.5% to $11.84 on 181.7 million outstanding shares of common stock as of June 30, 2025, compared to $11.55 on 173.3 million outstanding shares of common stock as of March 31, 2025. The increase in NAV per share was primarily attributed to the accretion from ATM issuance.

20.    On July 31, 2025, the Company submitted its quarterly report for the period ended June 30, 2025 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The quarterly report further reported the purported valuation procedure the Company takes, the fair value of the Company's portfolio by industry sector, and the Company's portfolio and investment activity, including that prospective portfolio companies are "***subject to completion of our due diligence and final investment committee approval process***," and commitments are subject to "***underwriting and ongoing portfolio maintenance***." Specifically, the quarterly report stated as follows, in relevant part:

In accordance with procedures approved by its Board, the Company values investments on a quarterly basis following a multistep valuation process. The quarterly Board approved multi-step valuation process is described below:

(1) The Company's quarterly valuation process begins with each portfolio company being initially valued by the investment professionals responsible for the portfolio investment;

(2) Preliminary valuation conclusions and business-based assumptions, along with any applicable fair value marks provided by an independent firm, are reviewed with

CLASS ACTION COMPLAINT

9

the Company's investment committee and certain member(s) of credit group as necessary;

(3) The Valuation Committee reviews the preliminary valuations recommended by the investment committee and certain member(s) of the credit group of each investment in the portfolio and determines the fair value of each investment in the Company's portfolio in good faith and recommends the valuation determinations to the Audit Committee of the Board;

(4) The Audit Committee of the Board provides oversight of the quarterly valuation process in accordance with Rule 2a-5, which includes a review of the quarterly reports prepared by the Valuation Committee, reviews the fair valuation determinations made by the Valuation Committee, and approves such valuations for inclusion in public reporting and disclosures, as appropriate; and

(5) The Board, upon the recommendation of the Audit Committee, discusses valuations and approves the fair value of each investment in the Company's portfolio.

\*                    \*                    \*

The following table shows the fair value of the Company's portfolio by industry sector as of June 30, 2025 and December 31, 2024:

| (in thousands) | June 30, 2025 | | December 31, 2024 | |
| --- | --- | --- | --- | --- |
| | Investments at Fair Value | Percentage of Total Portfolio | Investments at Fair Value | Percentage of Total Portfolio |
| Software | $ 1,471,080 | 35.2% | $ 1,081,100 | 29.5% |
| Drug Discovery & Development | 1,035,769 | 24.8% | 1,080,390 | 29.5% |
| Healthcare Services, Other | 755,202 | 18.1% | 610,184 | 16.7% |
| Consumer & Business Services | 375,233 | 9.0% | 372,641 | 10.2% |
| Defense Technologies | 139,991 | 3.4% | — | 0.0% |
| Diversified Financial Services | 118,110 | 2.8% | 113,491 | 3.1% |
| Medical Devices & Equipment | 75,436 | 1.8% | 74,962 | 2.0% |
| Electronics & Computer Hardware | 50,666 | 1.2% | 162,888 | 4.5% |
| Biotechnology Tools | 34,836 | 0.8% | 35,434 | 1.0% |
| Communications & Networking | 27,937 | 0.7% | 27,700 | 0.8% |
| Information Services | 24,233 | 0.6% | 24,356 | 0.7% |
| Sustainable and Renewable Technology | 22,723 | 0.5% | 27,696 | 0.8% |
| Manufacturing Technology | 20,650 | 0.5% | 1,162 | 0.0% |
| Space Technologies | 15,446 | 0.4% | 45,700 | 1.2% |
| Consumer & Business Products | 8,663 | 0.2% | 1,497 | 0.0% |
| Semiconductors | 345 | 0.0% | 704 | 0.0% |
| Media/Content/Info | 157 | 0.0% | 63 | 0.0% |
| Drug Delivery | 9 | 0.0% | 10 | 0.0% |
| **Total** | $ 4,176,486 | 100.0% | $ 3,659,978 | 100.0% |

\*                    \*                    \*

***Portfolio and Investment Activity***

The total fair value of our investment portfolio as of June 30, 2025 and December 31, 2024 was as follows:

| (in millions) | Fair Value | |
| --- | --- | --- |
| | June 30, 2025 | December 31, 2024 |
| Debt | $ 3,978.7 | $ 3,494.6 |
| Equity | 155.8 | 128.7 |
| Warrants | 35.5 | 30.5 |
| Investment Funds & Vehicles | 6.5 | 6.2 |
| Total Investment Portfolio | $ 4,176.5 | $ 3,660.0 |

Our investments in portfolio companies take a variety of forms, including unfunded contractual commitments and funded investments. Not all debt commitments represent future cash requirements. Unfunded contractual commitments depend upon a portfolio company reaching certain milestones before the debt commitment is available to the portfolio company, which is expected to affect our funding levels. *These commitments are subject to the same underwriting and ongoing portfolio maintenance as the on-balance sheet financial instruments that we hold*. Debt commitments generally fund over the year following the underwriting of such debt commitment. From time to time, unfunded contractual commitments may expire without being drawn and thus do not represent future cash requirements.

Prior to entering into a contractual commitment, we generally issue a non-binding term sheet to a prospective portfolio company. *Non-binding term sheets are subject to completion of our due diligence and final investment committee approval process,* as well as the negotiation of definitive documentation with the prospective portfolio companies. These non-binding term sheets generally convert to contractual commitments in approximately 90 days from signing and some portion may be assigned or allocated to or directly originated by the Adviser Funds prior to or after closing. Not all non-binding term sheets are expected to close and do not necessarily represent future cash requirements.

21.    On October 30, 2025, Hercules Capital issued a press release announcing its earnings for the quarter ended September 30, 2025.  The press release touted the Company's financial results, including the purported value of its total investment portfolio and alleged NAV of $12.05. Specifically, the press release stated as follows, in relevant part:

**Debt Investment Portfolio**

Hercules delivered Q3 new debt and equity commitments totaling $846.2 million and Q3 new fundings totaling $504.6 million.

During the third quarter, Hercules realized early loan repayments of $262.3 million which, along with normal scheduled amortization of $2.3 million, resulted in total debt repayments of $264.6 million.

The new debt investment origination and funding activities led to a net debt investment portfolio increase of $95.9 million during the third quarter on a cost basis.

**The Company's total investment portfolio, (at cost and fair value) by category, quarter-over-quarter is highlighted below:**

**Total Investment Portfolio: Q2 2025 to Q3 2025**

| (in millions) | Debt | Equity & Other Investments | Warrants | Total Portfolio |
|---|---|---|---|---|
| Balances at Cost at June 30, 2025 | $ 3,977.3 | $ 184.0 | $ 31.2 | $ 4,192.5 |
| New fundings[a] | 493.9 | 5.8 | 4.9 | 504.6 |
| Fundings assigned to or directly funded by Adviser Funds | (130.1) | (1.1) | (1.1) | (132.3) |
| Principal payments received on investments | (2.3) | — | — | (2.3) |
| Early payoffs[b] | (262.3) | — | — | (262.3) |
| Proceeds from sale of debt investments | (20.0) | — | — | (20.0) |
| Net changes attributed to conversions, liquidations, and fees | 16.7 | (5.2) | (0.9) | 10.6 |
| Net activity during Q3 2025 | 95.9 | (0.5) | 2.9 | 98.3 |
| Balances at Cost at September 30, 2025 | $ 4,073.2 | $ 183.5 | $ 34.1 | $ 4,290.8 |
| | | | | |
| Balances at Fair Value at June 30, 2025 | $ 3,978.7 | $ 162.3 | $ 35.5 | $ 4,176.5 |
| Net activity during Q3 2025 | 95.9 | (0.5) | 2.9 | 98.3 |
| Net change in unrealized appreciation (depreciation) | 21.8 | 8.1 | 2.4 | 32.3 |
| FX unrealized gain (loss) | (0.8) | — | (0.1) | (0.9) |
| Total net activity during Q3 2025 | 116.9 | 7.6 | 5.2 | 129.7 |
| Balances at Fair Value at September 30, 2025 | $ 4,095.6 | $ 169.9 | $ 40.7 | $ 4,306.2 |

\*                    \*                    \*

**Net Asset Value**

As of September 30, 2025, the Company's net assets were $2.2 billion, compared to $2.2 billion at the end of Q2 2025. NAV per share increased 1.8% to $12.05 on 181.8 million outstanding shares of common stock as of September 30, 2025, compared to $11.84 on 181.7 million outstanding shares of common stock as of June 30, 2025. The increase in NAV per share was primarily attributed to the unrealized appreciation on our investment portfolio.

22. On October 30, 2025, the Company submitted its quarterly report for the period ended October 30, 2025, on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The quarterly report further reported the purported valuation procedure the Company takes, the fair value of the Company's portfolio by industry sector, and the Company's portfolio and investment activity, including that prospective portfolio companies are "***subject to completion of our due diligence and final investment committee approval process,***" and commitments are subject to "***underwriting and ongoing portfolio maintenance.***" Specifically, the quarterly report stated as follows, in relevant part:

In accordance with procedures approved by its Board, the Company values investments on a quarterly basis following a multistep valuation process. The quarterly Board approved multi-step valuation process is described below:

(1) The Company's quarterly valuation process begins with each portfolio company being initially valued by the investment professionals responsible for the portfolio investment;

(2) Preliminary valuation conclusions and business-based assumptions, along with any applicable fair value marks provided by an independent firm, are reviewed with

the Company's investment committee and certain member(s) of credit group as necessary;

(3) The Valuation Committee reviews the preliminary valuations recommended by the investment committee and certain member(s) of the credit group of each investment in the portfolio and determines the fair value of each investment in the Company's portfolio in good faith and recommends the valuation determinations to the Audit Committee of the Board;

(4) The Audit Committee of the Board provides oversight of the quarterly valuation process in accordance with Rule 2a-5, which includes a review of the quarterly reports prepared by the Valuation Committee, reviews the fair valuation determinations made by the Valuation Committee, and approves such valuations for inclusion in public reporting and disclosures, as appropriate; and

(5) The Board, upon the recommendation of the Audit Committee, discusses valuations and approves the fair value of each investment in the Company's portfolio.

*                         *                         *

The following table shows the fair value of the Company's portfolio by industry sector as of September 30, 2025 and December 31, 2024:

| (in thousands) | September 30, 2025 | | December 31, 2024 | |
|---|---|---|---|---|
| | Investments at Fair Value | Percentage of Total Portfolio | Investments at Fair Value | Percentage of Total Portfolio |
| Software | $ 1,519,464 | 35.3% | $ 1,081,100 | 29.5% |
| Drug Discovery & Development | 988,816 | 23.0% | 1,080,390 | 29.5% |
| Healthcare Services, Other | 833,492 | 19.3% | 610,184 | 16.7% |
| Consumer & Business Services | 433,323 | 10.1% | 372,641 | 10.2% |
| Defense Technologies | 140,622 | 3.3% | — | 0.0% |
| Diversified Financial Services | 104,221 | 2.4% | 113,491 | 3.1% |
| Medical Devices & Equipment | 76,389 | 1.8% | 74,962 | 2.0% |
| Electronics & Computer Hardware | 51,080 | 1.2% | 162,888 | 4.5% |
| Space Technologies | 34,019 | 0.8% | 45,700 | 1.2% |
| Communications & Networking | 27,535 | 0.6% | 27,700 | 0.8% |
| Information Services | 23,988 | 0.5% | 24,356 | 0.7% |
| Biotechnology Tools | 22,326 | 0.5% | 35,434 | 1.0% |
| Sustainable and Renewable Technology | 21,300 | 0.5% | 27,696 | 0.8% |
| Manufacturing Technology | 20,419 | 0.5% | 1,162 | 0.0% |
| Consumer & Business Products | 8,716 | 0.2% | 1,497 | 0.0% |
| Semiconductors | 339 | 0.0% | 704 | 0.0% |
| Media/Content/Info | 93 | 0.0% | 63 | 0.0% |
| Drug Delivery | 12 | 0.0% | 10 | 0.0% |
| **Total** | $ 4,306,154 | 100.0% | $ 3,659,978 | 100.0% |

*                         *                         *

### *Portfolio and Investment Activity*

The total fair value of our investment portfolio as of September 30, 2025 and December 31, 2024 was as follows:

| (in millions) | Fair Value | |
|---|---|---|
| | September 30, 2025 | December 31, 2024 |
| Debt | $ 4,095.6 | $ 3,494.6 |
| Equity | 163.3 | 128.7 |
| Warrants | 40.7 | 30.5 |
| Investment Funds & Vehicles | 6.6 | 6.2 |
| **Total Investment Portfolio** | $ 4,306.2 | $ 3,660.0 |

CLASS ACTION COMPLAINT

13

Our investments in portfolio companies take a variety of forms, including unfunded contractual commitments and funded investments. Not all debt commitments represent future cash requirements. Unfunded contractual commitments depend upon a portfolio company reaching certain milestones before the debt commitment is available to the portfolio company, which is expected to affect our funding levels. ***These commitments are subject to the same underwriting and ongoing portfolio maintenance as the on-balance sheet financial instruments that we hold.*** Debt commitments generally fund over the year following the underwriting of such debt commitment. From time to time, unfunded contractual commitments may expire without being drawn and thus do not represent future cash requirements.

Prior to entering into a contractual commitment, we generally issue a non-binding term sheet to a prospective portfolio company. ***Non-binding term sheets are subject to completion of our due diligence and final investment committee approval process,*** as well as the negotiation of definitive documentation with the prospective portfolio companies. These non-binding term sheets generally convert to contractual commitments in approximately 90 days from signing and some portion may be assigned or allocated to or directly originated by the Adviser Funds prior to or after closing. Not all non-binding term sheets are expected to close and do not necessarily represent future cash requirements.

23.     On February 3, 2026, the Company filed a form 8-K with the SEC, reporting financial results for the quarter ended December 31, 2025, including a NAV of $12.10 to $12.16. Specifically the report stated as follows in relevant part:

As of the date hereof:

- The preliminary estimate of our net asset value ("NAV") per share of our common stock as of December 31, 2025 is in the range of $12.10 to $12.16, representing an increase of $0.05 to $0.11 per share, or 0.4% to 0.9%, from the NAV per share of $12.05 as of September 30, 2025.

- The preliminary estimate of our fourth quarter 2025 net realized gains/(losses) is approximately $20 million of realized gains.

- The preliminary estimate of our fourth quarter 2025 net investment income is in the range of $0.47 to $0.49 per share of our common stock.

- The preliminary estimate of our fourth quarter 2025 gross new debt and equity commitments and fundings is approximately $1.0 billion and $0.5 billion, respectively.

- We preliminarily estimate that our investments on non-accrual status total comprised <0.5% of the total investment portfolio at both fair value and cost as of December 31, 2025, representing a decrease from 1.2% of the total investment portfolio of cost as of September 30, 2025.

24.     On February 12, 2026, Hercules Capital issued a press release announcing its earnings for the quarter and year ended December 31, 2025. The press release touted the Company's financial results, including the purported value of its total investment portfolio and alleged NAV of

$12.13. The press release further touted the Company's purported "***disciplined underwriting that is the hallmark of our Company***" as well as its "***Continued Credit Discipline and Strong Credit Performance***." Specifically, the press release stated as follows, in relevant part:

**Full-Year ending December 31, 2025 Financial Highlights**

- *Record full-year 2025 Total Investment Income of $532.5 million, an increase of 7.9% year-over-year*
- *Record full-year 2025 NII of $341.7 million, or $1.91 per share, an increase of 4.9% year-over-year*
- *Record full-year 2025 total gross debt and equity commitments of $3.92 billion, an increase of 45.7% year-over-year*
- *Record full-year 2025 total gross fundings of $2.28 billion, an increase of 25.9% year-over-year*
- *Record full-year 2025 net debt investment portfolio growth of $748.5 million*
- *Unscheduled early loan repayments of $811.2 million*

\*                    \*                    \*

"Our record-breaking performance in 2025 - which included achieving all-time highs in new debt and equity commitments, gross fundings, net debt portfolio growth, and investment income - reflects our differentiated approach to investing, the strength of the Hercules platform and our unrivaled standing in the venture lending market," stated Scott Bluestein, chief executive officer and chief investment officer of Hercules. ***"Reaching $3.92 billion in new commitments and $2.28 billion in gross fundings, up 45.7% and 25.9% year-over-year, respectively, demonstrates our ability to scale and support the world's most innovative companies while maintaining the disciplined underwriting that is the hallmark of our Company."***

\*                    \*                    \*

Bluestein concluded, "We remain committed to our ***fundamental principles of disciplined credit and underwriting,*** maintaining ample liquidity and prudent leverage, and expanding the capacity of our private funds. These principles position the Company to maintain our strong growth trajectory throughout 2026 and maximize shareholder returns."

\*                    \*                    \*

**Debt Investment Portfolio**

Hercules delivered Q4 total gross debt and equity commitments totaling $1,058.3 million and Q4 gross new fundings totaling $522.3 million.

During the fourth quarter, Hercules realized early loan repayments of $149.7 million which, along with normal scheduled amortization of $19.5 million, resulted in total debt repayments of $169.2 million.

The new debt investment origination and funding activities led to a net debt investment portfolio increase of $190.7 million during the fourth quarter on a cost basis.

**The Company's total investment portfolio, (at cost and fair value) by category, quarter-over-quarter is highlighted below:**

**Total Investment Portfolio: Q3 2025 to Q4 2025**

| (in millions) | Debt | Equity & Other Investments | Warrants | Total Portfolio |
|---|---|---|---|---|
| Balances at Cost at September 30, 2025 | $ 4,073.2 | $ 183.5 | $ 34.1 | $ 4,290.8 |
| New fundings[a] | 518.8 | 1.1 | 2.4 | 522.3 |
| Fundings assigned to or directly funded by Adviser Funds | (170.2) | — | (0.8) | (171.0) |
| Principal payments received on investments | (19.5) | — | — | (19.5) |
| Early payoffs[b] | (149.7) | — | — | (149.7) |
| Assets Sale - Participants | (7.0) | — | — | (7.0) |
| Net changes attributed to conversions, liquidations, and fees | 18.3 | (14.1) | (2.3) | 1.9 |
| Net activity during Q4 2025 | 190.7 | (13.0) | (0.7) | 177.0 |
| Balances at Cost at December 31, 2025 | $ 4,263.9 | $ 170.5 | $ 33.4 | $ 4,467.8 |
| | | | | |
| Balances at Fair Value at September 30, 2025 | $ 4,095.6 | $ 169.9 | $ 40.7 | $ 4,306.2 |
| Net activity during Q4 2025 | 190.7 | (13.0) | (0.7) | 177.0 |
| Net change in unrealized appreciation (depreciation) | (7.0) | (10.8) | 1.1 | (16.7) |
| FX unrealized gain (loss) | 0.1 | — | — | 0.1 |
| Total net activity during Q4 2025 | 183.8 | (23.8) | 0.4 | 160.4 |
| Balances at Fair Value at December 31, 2025 | $ 4,279.4 | $ 146.1 | $ 41.1 | $ 4,466.6 |

\*                    \*                    \*

**Continued Credit Discipline and Strong Credit Performance**

Hercules' net cumulative realized gain/(loss) position, since its first origination activities in October 2004 through December 31, 2025, (including net loan, warrant and equity activity and excluding loss on debt extinguishment, foreign exchange movements and other non-credit related losses) on investments totaled ($114.4) million, on a GAAP basis, spanning more than 21 years of investment activities.

When compared to total net new debt investment commitments during the same period of $22.3 billion, the total realized gain/(loss) since inception of ($114.4) million represents approximately 51 basis points ("bps"), or 0.51%, of cumulative debt commitments, or an effective annualized loss rate of 2.4 bps, or 0.024%.

\*                    \*                    \*

**Net Asset Value**

As of December 31, 2025, the Company's net assets were $2.2 billion, compared to $2.2 billion at the end of Q3 2025. NAV per share increased 0.7% to $12.13 on 182.7 million outstanding shares of common stock as of December 31, 2025, compared to $12.05 on 181.8 million outstanding shares of common stock as of September 30, 2025. The increase in NAV per share was primarily attributed to the accretion from the sale of ATM equity at a price above NAV and net realized and unrealized gains during the quarter.

25.     On February 12, 2026, the Company submitted its annual report for the fiscal year ended December 31, 2025 on a Form 10-K filed with the SEC (the "FY25 10-K"). The FY25 10-K described the Company's purported deal sourcing pipeline, including that the Company "use[s] [its]

relationships in the financial sponsor community to originate investment opportunities," and that the "***origination process for our investments includes sourcing, screening, preliminary due diligence and deal structuring and negotiation***" with a team "***which consists of more than 50 investment professionals.***"  Specifically the FY25 10-K stated as follows, in relevant part:

> ***We use our relationships in the financial sponsor community to originate investment opportunities.*** Because venture capital and private equity funds typically invest solely in the equity securities of their portfolio companies, we believe that our debt investments will be viewed as an attractive and complementary source of capital, both by the portfolio company and by the portfolio company's financial sponsor. In addition, we believe that many venture capital and private equity fund sponsors encourage their portfolio companies to use debt financing for a portion of their capital needs as a means of potentially enhancing equity returns, minimizing equity dilution and increasing valuations prior to a subsequent equity financing round or a liquidity event.
>
> *                    *                    *
>
> ***Origination***
>
> ***The origination process for our investments includes sourcing, screening, preliminary due diligence and deal structuring and negotiation,*** all leading to an executed non-binding term sheet. As of December 31, 2025, ***our investment origination team, which consists of more than 50 investment professionals, is headed by our Chief Investment Officer and Chief Executive Officer. The origination team is responsible for sourcing potential investment opportunities and members of the investment origination team use their extensive relationships with various leading financial sponsors, management contacts within technology-related companies, trade sources, industry conferences and various publications to source prospective portfolio companies.*** Our investment origination team is divided into life sciences, venture-backed technology, and private equity/ sponsor-backed technology sub-teams to better source potential portfolio companies.
>
> In addition, we have developed a comprehensive proprietary database to track various aspects of our investment process including sourcing, originations, transaction monitoring and post-investment performance. Our proprietary database allows our origination team to maintain, cultivate and grow our industry relationships while providing our origination team with comprehensive details on companies in the technology-related industries and their financial sponsors.
>
> ***If a prospective portfolio company generally meets certain underwriting criteria, we perform preliminary due diligence, which may include high level company and technology assessments, evaluation of its financial sponsors' support, market analysis, competitive analysis, identifying key management, risk analysis and transaction size, pricing, return analysis and structure analysis. If the preliminary due diligence is satisfactory, and the origination team recommends moving forward,*** we then structure, negotiate and execute a non-binding term sheet with the potential portfolio company. Upon execution of a term sheet, the investment opportunity moves to the underwriting process to complete formal due diligence review and approval.
>
> ***Underwriting***

The underwriting review includes formal due diligence and approval of the proposed investment in the portfolio company.

*Due Diligence* - **Our due diligence on a prospective investment is typically completed by two or more investment professionals whom we define as the underwriting team.** The underwriting team for a proposed investment consists of the deal sponsor who typically possesses general industry knowledge and is responsible for originating and managing the transaction, other investment professionals who perform due diligence, credit and corporate financial analyses and our legal professionals, as needed. To ensure consistent underwriting, we generally use our standardized due diligence methodologies, which include due diligence on financial performance and credit risk as well as an analysis of the operations and the legal and applicable regulatory framework of a prospective portfolio company. The members of the underwriting team work together to conduct due diligence and understand the relationships among the prospective portfolio company's business plan, operations and financial performance.

**As part of our evaluation of a proposed investment, the underwriting team prepares an investment memorandum for presentation to the investment committee. In preparing the investment memorandum, the underwriting team typically interviews select key management of the company and select financial sponsors and assembles information necessary to the investment decision.** If and when appropriate, the investment professionals may also contact industry experts and customers, vendors or, in some cases, competitors of the company. The underwriting team collaborates with the credit and legal teams to ensure the final credit underwriting deal structure meets our standards. In addition to the aforementioned members of the investment team, each deal is also assigned to a member of the credit team. The credit team is responsible for making sure that all material risks in the transaction are identified and mitigated to the extent possible in the investment memorandum and that the legal documentation properly reflects the transaction as approved by the investment committee.

[Remainder of page intentionally left blank.]

26.    The FY25 10-K further reported the purported the fair value of the Company's portfolio by industry sector, as well as the Company's individual portfolio company investment amounts and classification, including companies Houzz and AppDirect, among others, classified as "consumer & business services" companies as opposed to "Application Software." Specifically, the FY25 10-K stated as follows, in relevant part:

| Portfolio Company | Type of Investment | Maturity Date | Interest Rate and Floor[1] | | Principal Amount | Cost[2] | Value |
|---|---|---|---|---|---|---|---|
| Sisense Ltd. | Senior Secured | July 2027 | Prime + 1.50%, Floor rate 9.50%, PIK Interest 1.95%, 5.95% Exit Fee | $ | 30,613 | $ 31,624 | $ 31,029 |
| Smartsheet Inc. | Senior Secured | January 2031 | 3-month SOFR + 6.50%, Floor rate 7.25% | $ | 46,785 | 45,957 | 46,204 |
| Snappt, Inc. | Senior Secured | April 2029 | Prime + 2.35%, Floor rate 8.85%, PIK Interest 1.00%, 4.25% Exit Fee | $ | 20,139 | 20,071 | 19,753 |
| Streamline Healthcare Solutions | Senior Secured | June 2030 | 3-month SOFR + 7.30%, Floor rate 8.30% | $ | 21,000 | 20,403 | 20,443 |
| Suzy, Inc. | Senior Secured | August 2027 | Prime + 1.75%, Floor rate 10.00%, PIK Interest 1.95%, 3.45% Exit Fee | $ | 24,827 | 24,901 | 24,378 |
| TaxCalc | Senior Secured | November 2029 | Daily SONIA + 8.17%, Floor rate 8.67% | £ | 8,250 | 10,557 | 10,897 |
| Tipalti Solutions Ltd. | Senior Secured | April 2029 | Prime + 0.45%, Floor rate 6.45%, PIK Interest 2.30% | $ | 72,488 | 72,141 | 70,507 |
| | Senior Secured | April 2029 | Prime + 0.45%, Floor rate 6.45%, PIK Interest 2.30%, 3.75% Exit Fee | $ | 42,673 | 42,708 | 42,622 |
| Total Tipalti Solutions Ltd. | | | | $ | 115,161 | 114,849 | 113,129 |
| Ushur, Inc. | Senior Secured | June 2028 | Prime + 2.20%, Floor rate 9.20%, 3.95% Exit Fee | $ | 14,400 | 14,191 | 14,106 |
| Zappi, Inc. | Senior Secured | December 2027 | 3-month SOFR + 8.03%, Floor rate 9.03% | $ | 12,600 | 12,456 | 12,614 |
| ZeroEyes, Inc. | Senior Secured | May 2030 | Prime + 2.00%, Floor rate 9.50%, PIK Interest 2.00%, 1.50% Exit Fee | $ | 16,414 | 16,146 | 16,218 |
| Subtotal: Application Software (48.30%)* | | | | | | 1,066,058 | 1,070,369 |
| Biotechnology Tools | | | | | | | |
| Antheia, Inc. | Senior Secured | August 2029 | Prime + 2.85%, Floor rate 10.35%, 5.55% Exit Fee | $ | 21,250 | 19,683 | 19,683 |
| Subtotal: Biotechnology Tools (0.89%)* | | | | | | 19,683 | 19,683 |
| Communications & Networking | | | | | | | |
| Aryaka Networks, Inc. | Senior Secured | December 2028 | Prime + 1.80%, Floor rate 9.30%, PIK Interest 1.25%, 6.73% Exit Fee | $ | 28,271 | 28,536 | 26,263 |
| Subtotal: Communications & Networking (1.19%)* | | | | | | 28,536 | 26,263 |
| Consumer & Business Products | | | | | | | |
| Weee! Inc. | Senior Secured | April 2028 | Prime + 2.25%, Floor rate 9.75%, 2.50% Exit Fee | $ | 7,500 | 7,472 | 7,583 |
| Subtotal: Consumer & Business Products (0.34%)* | | | | | | 7,472 | 7,583 |
| Consumer & Business Services | | | | | | | |
| AppDirect, Inc. | Senior Secured | September 2029 | Prime + 2.05%, Floor rate 8.55%, PIK Interest 1.00%, 4.70% Exit Fee | $ | 55,357 | 54,713 | 54,713 |
| Carwow LTD | Senior Secured | December 2027 | Prime + 4.70%, Floor rate 11.45%, PIK Interest 1.45%, 4.95% Exit Fee | £ | 20,662 | 28,533 | 27,960 |
| Finix Payments, Inc. | Senior Secured | December 2029 | Prime + 2.50%, Floor rate 9.25%, 4.95% Exit Fee | $ | 7,000 | 6,889 | 6,889 |
| GoEuro Travel GmbH | Senior Secured | November 2029 | Prime + 3.45%, Floor rate 10.45%, 4.50% Exit Fee | $ | 48,750 | 48,750 | 49,137 |
| Houzz, Inc. | Convertible Debt | May 2028 | PIK Interest 12.00% | $ | 28,901 | 28,901 | 30,986 |
| Jobandtalent USA, Inc. | Senior Secured | October 2028 | 1-month SOFR + 3.50%, Floor rate 4.50%, PIK Interest 3.25%, 6.42% Exit Fee | $ | 14,270 | 14,839 | 14,082 |
| Nerdy Inc. | Senior Secured | November 2029 | Prime + 3.50%, Floor rate 10.75%, 7.50% Exit Fee | $ | 14,000 | 13,867 | 13,867 |
| Peek Travel, Inc. | Senior Secured | October 2028 | Prime + 1.75%, Floor rate 9.25%, PIK Interest 1.00%, 4.95% Exit Fee | $ | 16,515 | 16,280 | 16,280 |
| Plentific Ltd | Senior Secured | October 2026 | Prime + 2.55%, Floor rate 11.05%, 2.95% Exit Fee | $ | 3,035 | 3,073 | 3,073 |
| Provi | Senior Secured | December 2027 | Prime + 4.40%, Floor rate 10.65%, 1.00% Exit Fee | $ | 15,443 | 15,394 | 15,389 |
| Riviera Partners LLC | Senior Secured | March 2028 | 1-month SOFR + 8.28%, Floor rate 9.28% | $ | 36,126 | 35,850 | 35,546 |
| RVShare, LLC | Senior Secured | December 2026 | 3-month SOFR + 9.50%, Floor rate 10.50% | $ | 25,809 | 25,719 | 25,719 |
| SeatGeek, Inc. | Senior Secured | May 2026 | Prime + 7.00%, Floor rate 10.50%, PIK Interest 0.50%, 4.50% Exit Fee | $ | 25,456 | 26,250 | 26,250 |
| | Senior Secured | July 2026 | Prime + 2.50%, Floor rate 10.75%, PIK Interest 0.50%, 3.50% Exit Fee | $ | 78,434 | 79,685 | 79,685 |
| Total SeatGeek, Inc. | | | | $ | 103,890 | 105,935 | 105,935 |

\*                        \*                        \*

The following table shows the fair value of the Company's portfolio by industry sector as of December 31, 2025 and December 31, 2024:

| (in thousands) | December 31, 2025 | | December 31, 2024 | |
| --- | --- | --- | --- | --- |
| | Investments at Fair Value | Percentage of Total Portfolio | Investments at Fair Value | Percentage of Total Portfolio |
| Application Software[1] | $ 1,087,954 | 24.3% | $ 790,180 | 21.6% |
| Drug Discovery & Development | 1,039,712 | 23.3% | 1,080,390 | 29.5% |
| Healthcare Services, Other | 838,508 | 18.8% | 610,184 | 16.7% |
| System Software[1] | 472,144 | 10.6% | 290,920 | 7.9% |
| Consumer & Business Services | 449,631 | 10.1% | 372,641 | 10.2% |
| Defense Technologies | 140,458 | 3.1% | — | 0.0% |
| Diversified Financial Services | 105,896 | 2.4% | 113,491 | 3.1% |
| Medical Devices & Equipment | 77,257 | 1.7% | 74,962 | 2.0% |
| Electronics & Computer Hardware | 66,992 | 1.5% | 162,888 | 4.5% |
| Space Technologies | 47,816 | 1.1% | 45,700 | 1.2% |
| Sustainable and Renewable Technology | 35,759 | 0.8% | 27,696 | 0.8% |
| Communications & Networking | 26,263 | 0.6% | 27,700 | 0.8% |
| Information Services | 25,889 | 0.6% | 24,356 | 0.7% |
| Biotechnology Tools | 23,164 | 0.5% | 35,434 | 1.0% |
| Manufacturing Technology | 20,190 | 0.4% | 1,162 | 0.0% |
| Consumer & Business Products | 8,810 | 0.2% | 1,497 | 0.0% |
| Semiconductors | 158 | 0.0% | 704 | 0.0% |
| Media/Content/Info | 32 | 0.0% | 63 | 0.0% |
| Drug Delivery | 14 | 0.0% | 10 | 0.0% |
| Total | $ 4,466,647 | 100.0% | $ 3,659,978 | 100.0% |

27.    The FY25 10-K further reported the purported valuation procedure the Company takes and the Company's portfolio and investment activity, including that prospective portfolio companies are "**subject to completion of our due diligence and final investment committee approval process**," and commitments are subject to "**underwriting and ongoing portfolio maintenance**." Specifically, the FY25 10-K stated as follows, in relevant part:

In accordance with procedures approved by its Board, the Company values investments on a quarterly basis following a multistep valuation process. The quarterly Board approved multi-step valuation process is described below:

(1) The Company's quarterly valuation process begins with each portfolio company being initially valued by the investment professionals responsible for the portfolio investment;

(2) Preliminary valuation conclusions and business-based assumptions, along with any applicable fair value marks provided by an independent firm, are reviewed with the Company's investment committee and certain member(s) of credit group as necessary;

(3) The Valuation Committee reviews the preliminary valuations recommended by the investment committee and certain member(s) of the credit group of each investment in the portfolio and determines the fair value of each investment in the Company's portfolio in good faith and recommends the valuation determinations to the Audit Committee of the Board;

(4) The Audit Committee of the Board provides oversight of the quarterly valuation process in accordance with Rule 2a-5, which includes a review of the quarterly

CLASS ACTION COMPLAINT
20

reports prepared by the Valuation Committee, reviews the fair valuation determinations made by the Valuation Committee, and approves such valuations for inclusion in public reporting and disclosures, as appropriate; and

(5) The Board, upon the recommendation of the Audit Committee, discusses valuations and approves the fair value of each investment in the Company's portfolio.

\*                              \*                              \*

***Portfolio and Investment Activity***

The total fair value of our investment portfolio as of December 31, 2025 and December 31, 2024 was as follows:

| (in millions) | Fair Value | |
| --- | --- | --- |
| | December 31, 2025 | December 31, 2024 |
| Debt | $ 4,279.4 | $ 3,494.6 |
| Equity | 139.0 | 128.7 |
| Warrants | 41.1 | 30.5 |
| Investment Funds & Vehicles | 7.1 | 6.2 |
| **Total Investment Portfolio** | $ 4,466.6 | $ 3,660.0 |

Our investments in portfolio companies take a variety of forms, including unfunded contractual commitments and funded investments. Not all debt commitments represent future cash requirements. Unfunded contractual commitments depend upon a portfolio company reaching certain milestones before the debt commitment is available to the portfolio company, which is expected to affect our funding levels. ***These commitments are subject to the same underwriting and ongoing portfolio maintenance as the on-balance sheet financial instruments that we hold.*** Debt commitments generally fund over the year following the underwriting of such debt commitment. From time to time, unfunded contractual commitments may expire without being drawn and thus do not represent future cash requirements.

Prior to entering into a contractual commitment, we generally issue a non-binding term sheet to a prospective portfolio company. ***Non-binding term sheets are subject to completion of our due diligence*** and final investment committee approval process, as well as the negotiation of definitive documentation with the prospective portfolio companies. These non-binding term sheets generally convert to contractual commitments in approximately 90 days from signing and some portion may be assigned or allocated to or directly originated by the Adviser Funds prior to or after closing. Not all non-binding term sheets are expected to close and do not necessarily represent future cash requirements.

28.     The above statements identified in ¶¶ 17-27 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors: (1) the Company overstated the due diligence with which it conducted its deal sourcing and/or loan origination process; (2) the Company overstated the due diligence with which it conducted its portfolio valuation process; (3) the Company reported misclassified portfolio investments; (4) as a result of the foregoing, the Company overstated and/or misrepresented its portfolio valuations; and (5) that, as a result of the

foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**Disclosures at the End of the Class Period**

29.    On February 27, 2026, at approximately 11:00 a.m. EST, Hunterbrook Media, an investment focused reporting outlet, published a report entitled "The Myth of Hercules Capital" (the "Report"). The Report stated that, "according to a former Hercules analyst who worked on deal sourcing" the Company's process for deal sourcing essentially amounted to "[g]o[ing] on the website for Google Ventures and just see what they invest in and just copy it." The Report stated, according to a former employee, deal sourcing managers "don't want anything else," and essentially just rely on other investors to have done due diligence, instead of doing their own.  Specifically, the Report stated as follows, in relevant part:

> But the sourcing process for those deals was not exactly scientific, according to a former Hercules analyst who worked on deal sourcing.
>
> "I got into the meeting with my manager and I was like, 'How do you do sourcing? Like, what's the juice? Like, what's your secret sauce?' And he was like, 'Go on the website for Google Ventures and just see what they invest in and just copy it. I don't want anything else.'"
>
> "That's actually a really bad way to do your due diligence," they added. "And that's actually a way that a lot of these, you know, like, FTX and all these things, that's how it happens because once these companies get one brand name on their investor list, right? Like Sequoia or something like that? Everybody else just freaking flocks to them."

30.    The Report continued, revealing that, "once Hercules makes the loans, the valuation process itself may warrant scrutiny," as "[a] former member of Hercules' finance team described a small, overstretched team with few checks in place." This second former employee revealed the valuations team "consisted of just four people in a single reporting line responsible for dozens of companies," with "few checks or cross-team review." The former employee noted this was contrary to how things were done at other public companies where, in contrast "[t]here is a strong push to do things the right way, to reinvent, to make sure that we're double-checking, triple-checking." The Report stated the former employee found this was not the case at Hercules. Specifically, the Report stated as follows, in relevant part:

And once Hercules makes the loans, the valuation process itself may warrant scrutiny. A former member of Hercules' finance team described a small, overstretched team with few checks in place.

"There wasn't a whole lot of fail-safes or backup checks," they said. "We would have kind of one stream of resources and backups," compared to other public companies where "there are multiple streams and cross-checking and cross-team development."

According to this former employee, a team responsible for preparing certain valuations that fed directly into the financial statements consisted of four people arranged in a single reporting line — an analyst, a senior, a manager, and a director — handling an important subset of valuations for Hercules.

"I don't think the team got the support that it needed," they said. "It was a small team and it was stretched quite thin."

Review was concentrated at the manager level. By the time work reached the director, the former employee recalled seeing few comments or corrections. The former employee, who now works in a similar role at another public company, described a starkly different environment.

"There is a strong push to do things the right way, to reinvent, to make sure that we're double-checking, triple-checking." Not so at Hercules.

31.    The Report also alleged that Hercules Capital underrepresents its significant software debt exposure, including by "assign[ing] certain businesses that describe themselves as software companies to categories outside of software."  The report also cast doubt on to the Company's book value, which marks its software debt "at 100 cents on the dollar" despite "billions worth of [software] debt across the industry falling into distressed territory." Specifically, the Report stated as follows, in relevant part:

The firm values its software loan portfolio, comprised of loans to smaller, often unprofitable startups, at more than 100 cents on the dollar — even in its 10-K released on February 12.

\*                    \*                    \*

**HERCULES CAPITAL, INC.**
**CONSOLIDATED SCHEDULE OF INVESTMENTS**
**December 31, 2025**
**(dollars in thousands)**

| Portfolio Company | Type of Investment | Maturity Date | Interest Rate and Floor[1] | Principal Amount | Cost[2] | Value | Footnotes |
|---|---|---|---|---|---|---|---|
| **Debt Investments** | | | | | | | |
| **Application Software[27]** | | | | | | | |
| Alchemer LLC | Senior Secured | May 2028 | 1-month SOFR + 8.14%, Floor rate 9.14% | $ 20,163 | $ 19,919 | $ 20,163 | (13)(17)(18) |
| AlphaSense, Inc. | Senior Secured | June 2029 | 3-month SOFR + 6.25%, Floor rate 8.25% | $ 20,000 | 19,849 | 19,916 | (11) |
| Annex Cloud | Senior Secured | June 2028 | PIK Interest 3-month SOFR + 9.99%, Floor rate 10.99% | $ 5,642 | 5,642 | 2,257 | (9)(13)(18) |
| | Senior Secured | December 2025 | PIK Interest 3-month SOFR + 9.99%, Floor rate 10.99% | $ 3,325 | 3,325 | 3,325 | (9)(18)(26) |
| | Senior Secured | June 2028 | PIK Interest 3-month SOFR + 5.73%, Floor rate 6.73% | $ 1,716 | 1,717 | 687 | (9)(18) |
| Total Annex Cloud | | | | $ 10,683 | 10,684 | 6,269 | |
| Babel Street | Senior Secured | December 2027 | 3-month SOFR + 8.01%, Floor rate 9.01% | $ 65,937 | 65,038 | 64,738 | (15)(17)(18) |
| Behavox Limited | Senior Secured | September 2027 | Prime - 0.55%, Floor rate 7.45%, PIK Interest 3.00%, 4.95% Exit Fee | $ 19,444 | 19,596 | 19,598 | (5)(10)(11)(14)(17) |
| Brain Corporation | Senior Secured | September 2028 | Prime + 1.35%, Floor rate 9.85%, PIK Interest 2.50%, 3.95% Exit Fee | $ 32,830 | 32,865 | 33,410 | (13)(14) |
| Carbyne, Inc. | Senior Secured | February 2029 | Prime + 3.50%, Floor rate 10.00%, 3.50% Exit Fee | $ 7,450 | 7,430 | 7,711 | (17) |
| Ceros, Inc. | Senior Secured | June 2027 | 3-month SOFR + 8.99%, Floor rate 9.89% | $ 22,656 | 22,543 | 22,506 | (18) |
| Chainalysis, Inc. | Senior Secured | June 2029 | Prime + 2.95%, Floor rate 10.45% | $ 36,412 | 35,954 | 36,143 | |
| Dashlane, Inc. | Senior Secured | December 2027 | Prime + 3.05%, Floor rate 11.55%, PIK Interest 1.10%, 6.28% Exit Fee | $ 45,986 | 46,789 | 48,034 | (11)(13)(14)(19) |
| Dispatch Technologies, Inc. | Senior Secured | April 2028 | 3-month SOFR + 7.86%, Floor rate 8.61% | $ 8,751 | 8,634 | 8,524 | (17)(18) |
| Distributed Creation Inc. | Senior Secured | April 2029 | Prime + 3.00%, Floor rate 10.25%, 4.50% Exit Fee | $ 25,000 | 24,825 | 25,024 | (11)(17) |
| DocPlanner | Senior Secured | January 2030 | Prime + 2.75%, Floor rate 9.75%, 4.25% Exit Fee | € 68,200 | 69,857 | 80,519 | (5)(10)(17) |
| Earnix, Inc. | Senior Secured | June 2029 | Prime - 1.15%, Floor rate 5.35%, PIK Interest 4.45% | $ 20,049 | 19,790 | 20,126 | (11)(14)(17) |
| Elation Health, Inc. | Senior Secured | April 2029 | Prime + 1.75%, Floor rate 9.25%, PIK Interest 1.30%, 3.95% Exit Fee | $ 13,575 | 13,283 | 13,477 | (11)(14)(17)(19) |
| Funnel Holding AB (publ) | Senior Secured | October 2029 | Prime + 0.60%, Floor rate 7.10%, Cap rate 8.60%, PIK Interest 3.00%, 2.25% Exit Fee | $ 18,433 | 18,196 | 18,196 | (5)(10)(14)(17)(19) |
| Imagen Technologies, Inc. | Senior Secured | November 2028 | Prime + 1.55%, Floor rate 9.05%, PIK Interest 1.00%, 3.95% Exit Fee | $ 7,501 | 7,360 | 7,360 | (6)(14)(17) |
| iSpot.tv, Inc. | Senior Secured | January 2029 | Prime + 2.25%, Floor rate 8.75%, PIK Interest 1.00%, 5.70% Exit Fee | $ 3,282 | 3,285 | 3,265 | (14)(17) |
| | Senior Secured | January 2029 | Prime + 1.40%, Floor rate 7.90%, PIK Interest 0.75%, 4.50% Exit Fee | $ 39,139 | 38,980 | 39,147 | (12)(14)(17) |
| Total iSpot.tv, Inc. | | | | $ 42,421 | 42,265 | 42,412 | |
| Khoros, LLC | Senior Secured | May 2030 | FIXED 10.00% | $ 11,704 | 11,704 | 11,399 | |
| LinenMaster, LLC | Senior Secured | August 2029 | 1-month SOFR + 8.28%, Floor rate 9.28% | $ 11,500 | 11,179 | 11,096 | (17)(18) |
| Loftware, Inc. | Senior Secured | March 2028 | 3-month SOFR + 7.88%, Floor rate 8.88% | $ 29,660 | 29,247 | 29,660 | (17)(18) |
| LogicSource | Senior Secured | July 2027 | 3-month SOFR + 8.93%, Floor rate 9.93% | $ 11,113 | 11,020 | 11,113 | (17)(18) |
| Mango Technologies, Inc. | Senior Secured | August 2030 | Prime + 2.25%, Floor rate 8.25%, 2.00% Exit Fee | $ 16,750 | 16,528 | 16,528 | (17) |
| Marigold Group, Inc. | Senior Secured | April 2028 | 6-month SOFR + 4.75%, Floor rate 5.75%, PIK Interest 5.25% | $ 44,555 | 43,960 | 40,736 | (13)(14)(19) |
| Omeda Holdings, LLC | Senior Secured | July 2027 | 3-month SOFR + 8.05%, Floor rate 9.05% | $ 7,303 | 7,207 | 7,303 | (11)(17)(18) |
| Pindrop Security, Inc. | Senior Secured | June 2029 | Prime + 3.50%, Floor rate 10.00%, 2.00% Exit Fee | $ 31,000 | 30,759 | 31,338 | (15)(17) |
| Proven Optics, LLC | Senior Secured | December 2030 | 3-month SOFR + 7.30%, Floor rate 8.30% | $ 15,000 | 14,726 | 14,726 | (17)(18) |
| Remodel Health Holdco, LLC | Senior Secured | December 2028 | Prime + 2.35%, Floor rate 10.35%, 6.50% Exit Fee | $ 25,000 | 25,126 | 25,334 | (6)(15) |
| Reveleer | Senior Secured | February 2027 | Prime + 0.65%, Floor rate 9.15%, PIK Interest 2.00%, 5.05% Exit Fee | $ 50,052 | 51,052 | 50,938 | (6)(14)(15) |
| ShadowDragon, LLC | Senior Secured | December 2026 | 3-month SOFR + 8.79%, Floor rate 9.69% | $ 6,000 | 5,958 | 5,958 | (17)(18) |
| Simon Data, Inc. | Senior Secured | March 2027 | Prime + 1.00%, Floor rate 8.75%, PIK Interest 1.95%, 3.58% Exit Fee | $ 11,350 | 11,560 | 11,343 | (12)(14) |

Hercules describes itself as the largest nonbank venture lender in the United States. The firm has committed over $25 billion since launching in 2003. The founder, Manuel Henriquez, resigned as CEO in 2019 after being charged in the college admissions fraud Operation Varsity Blues. Hercules has been led since by Scott Bluestein, who also serves as its chief investment officer.

In total, Hercules has software debt valued at $1.5 billion on its books, according to its financial statements: roughly 35% of the value of its total loan portfolio. That means 70 cents on every dollar of its net asset value (NAV) is backed by a software loan — because Hercules, like other BDCs, uses leverage to fund its portfolio, in its case at roughly a 1:1 ratio.

According to JPMorgan's recent assessment of the sector, this makes Hercules the most software-exposed lender of any meaningful size in America. And these numbers likely underestimate true exposure. Hunterbrook Media analyzed each loan Hercules disclosed in its most recent annual report and found that the firm assigns certain businesses that describe themselves as software companies to categories outside of software.

Take Houzz, which declares on its homepage that it offers, "Powerful software for construction and design."



Houzz website describing itself as "powerful software." Source: Houzz.

Another company that Hercules classifies as unrelated to software is AppDirect. That company describes itself as "the leading platform for selling, buying, and managing recurring technology services." In other words: It's a middleman for software companies, as the company lays out pretty clearly on its website.



The AppDirect website describes the company as "the leading platform for selling, buying, and managing recurring technology services." Source: AppDirect

\*　　　　　　\*　　　　　　\*

Hercules values its $1.5 billion software portfolio at around par — which is to say: The company doesn't expect meaningful losses. But the borrowers behind those loans operate in a sector that has just experienced a systemic pullback.

CLASS ACTION COMPLAINT
25

32.    On this news, Hercules's stock price fell $1.22, or 7.9%, to close at $14.21 per share on February 27, 2026, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

33.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Hercules Capital securities between May 1, 2025 and February 27, 2026, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

34.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Hercules Capital's shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Hercules Capital shares were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by Hercules Capital or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

35.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

36.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

37.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Hercules Capital; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

38.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

39.     The market for Hercules Capital's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Hercules Capital's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Hercules Capital's securities relying upon the integrity of the market price of the Company's securities and market information relating to Hercules Capital, and have been damaged thereby.

40.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Hercules Capital's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Hercules Capital's business, operations, and prospects as alleged herein.

41.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the

damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Hercules Capital's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

42. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

43. During the Class Period, Plaintiff and the Class purchased Hercules Capital's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

44. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Hercules Capital, their control over, and/or receipt and/or modification of Hercules Capital's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Hercules Capital, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

## (FRAUD-ON-THE-MARKET DOCTRINE)

45.     The market for Hercules Capital's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Hercules Capital's securities traded at artificially inflated prices during the Class Period.  On September 11, 2025, the Company's stock price closed at a Class Period high of $19.53 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Hercules Capital's securities and market information relating to Hercules Capital, and have been damaged thereby.

46.     During the Class Period, the artificial inflation of Hercules Capital's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Hercules Capital's business, prospects, and operations.   These material misstatements and/or omissions created an unrealistically positive assessment of Hercules Capital and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

47.     At all relevant times, the market for Hercules Capital's securities was an efficient market for the following reasons, among others:

(a)     Hercules Capital shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Hercules Capital filed periodic public reports with the SEC and/or the NYSE;

(c)     Hercules Capital regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press

releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Hercules Capital was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

48.    As a result of the foregoing, the market for Hercules Capital's securities promptly digested current information regarding Hercules Capital from all publicly available sources and reflected such information in Hercules Capital's share price. Under these circumstances, all purchasers of Hercules Capital's securities during the Class Period suffered similar injury through their purchase of Hercules Capital's securities at artificially inflated prices and a presumption of reliance applies.

49.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**NO SAFE HARBOR**

50.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward

looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Hercules Capital who knew that the statement was false when made.

### FIRST CLAIM

**Violation of Section 10(b) of The Exchange Act and**

**Rule 10b-5 Promulgated Thereunder**

**Against All Defendants**

51. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

52. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Hercules Capital's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

53. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Hercules Capital's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

54. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Hercules Capital's financial well-being and prospects, as specified herein.

55. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Hercules Capital's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Hercules Capital and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

56. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

57. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants'

material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Hercules Capital's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

58.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Hercules Capital's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Hercules Capital's securities during the Class Period at artificially high prices and were damaged thereby.

59.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Hercules Capital was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Hercules Capital securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

60.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

61.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**

**Violation of Section 20(a) of The Exchange Act**

**Against the Individual Defendants**

62.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

63.     Individual Defendants acted as controlling persons of Hercules Capital within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

64.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

65.     As set forth above, Hercules Capital and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other

members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)   Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)   Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  March 20, 2026              **GLANCY PRONGAY WOLKE & ROTTER LLP**

By:   */s/ Charles H. Linehan*
Robert V. Prongay
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:  clinehan@glancylaw.com

**HOLZER & HOLZER, LLC**
Corey D. Holzer
211 Perimeter Center Parkway, Suite 1010
Atlanta, GA 30346
Telephone: (770) 392-0090
Email: cholzer@holzerlaw.com

*Attorneys for Plaintiff Hunter Hanlon Taylor*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.     I, <u>Hunter Hanlon Taylor                    </u>, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.     I have reviewed a Complaint against Hercules Capital, Inc. ("Hercules" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.     I did not purchase or acquire Hercules securities at the direction of counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.     I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Hercules securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.     The attached sheet lists all of my transactions in Hercules securities during the Class Period as specified in the Complaint.

6.     During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.     I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.     I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

**Executed** <u>  3/20/2026             </u>
             **(Date)**

Signed by:

FF7D3048A30A49C...

**(Signature)**

Hunter Hanlon Taylor

**(Type or Print Name)**

## SUMMARY OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| 02/17/2026 | Purchase | 535 | $16.02 |
| 02/17/2026 | Purchase | 520 | $15.86 |
| 02/23/2026 | Purchase | 197 | $15.16 |
| 02/23/2026 | Purchase | 330 | $15.16 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |